Thompson, J.
delivered the opinion of the court.
The record does not inform us how the highway mentioned in the indictment was established, whether on a writ of ad quod damnum in pursuance of the statute concerning roads and landings (2 Rev. Code, ch. 236. § 1. 2. p. 233.) or by express grant of or contract with the proprietor of the land, or by presumption of such grant or contract arising from the public use of the way for a great length of time : the indictment (as it well might) describes it, in general terms, as a public high way,, without shewing how it became such. The case agreed, nevertheless, should have dis *823 closed how the public derived its right of way. Owing to this omission, the court, not exactly foreseeing how far its decision might depend on or be varied by the state of that fact or the omission to state it, would have remanded the cause, in order that the defect might be supplied, but for the suggestion of the counsel, that a speedy decision of the principal question intended to be adjourned, was interesting and important to a whole community, as it would be decisive of a numerous class of similar cases, arisen and likely to arise, and prevent and end much litigation; which suggestion was coupled with the concession both of the defendant’s counsel and attorney general, that the court should consider the case, as if the record stated the road to have been established, (as most probably it was) in pursuance of the statute, upon the execution and return of a writ of ad quod damnum.
The charge in the indictment is, for permitting or continuing a nuisance in an existing public highway; existing actually and in fact, and not merely by implication of law, if such a thing could be, where no road had ever been laid out or opened. The case agreed states, that the highway described in the indictment, was washed away by a recent fresh in the Ohio, and' did not exist at the date of the commission of the alleged nuisance; that the fence now complained of as an obstruction to the road and a nuisance, was legally and rightfully erected on the defendant’s private property; that it now stands where it was so erected, forming no obstruction to the road mentioned in the indictment (for that is gone) nor to any public highway now actually existing or in use, or that ever existed or was used, but that it covers ground over which the public have a right to open a public highway, in lieu of the one destroyed by the floods, though as yet the public have taken no steps to open a road upon the land where the fence stands. To say nothing, at present, of the variance between the ease charged and the case agreed, and supposing that the indictment had been so framed as to fit the case agreed; conceding too, for the *824 sake of argument, that, in such a case as the present, the public have a right to take adjacent land without compensation, to the extent of the loss sustained by the flood, for the purpose of a public highway; still the question remains, whether an individual in the defendant’s situation, is bound to remove a fence lawfully erected, and on failure to do so, is indictable as for a nuisance to a public highway? or, in such a case, would it be the duty of the. public, by its agent the surveyor of the old highway, to remove fences, lay out and open the new road, and until the road were thus laid out and opened by him, could a nuisance be committed upon it? We áre of opinion, that it was not the duty of the defendant to move in her fence, even though the right of the commonwealth be conceded, but on the contrary," it would be incumbent on the public to locate its right of way upon the particular land claimed for the highway. This it could and should do by the agency of the surveyor, by some such act as laying out and opening the road, removing fences &c., and until this were done, no nuisance could be sai.d to be erected or continued upon this imaginary highway. But suppose this were.otherwise,, and that a nuisance could be committed on a road never in fact opened, and alleged to exist only in legal contemplation of law, yet we are of opinion, that the variance between the case charged and the case agreed, would be fatal to this prosecution : for the nuisance is charged to have been permitted or continued in the road as existing and established, whereas it appears by the case agreed, to have been continued- on land .never before used or condemned for a road, where none was ever laid out or opened, where in-fact none ever actually existed, and where, if there be a right of way at all, it exists only in contemplation of law, the road designated in the indictment, having, been actually swept away. The decision of both or either of these points, in favor of the defendant, would suffice to dispose of this particular case. But they are, confessedly, the minor and technical points in the cause, and do not touch the important question intended to be adjourned.
*825 That question is, Whether, in the case of a public highway regularly established according to the statute, along the bank of a water course, if the ground on which the road runs be destroyed by abrasion, overflow, or permanent change of the bed of the stream, the commonwealth is entitled, at its pleasure, to substitute a sufficient quantity of the adjacent land for the highway, in lieu of that destroyed, without view, condemnation and compensation, in the manner prescribed by the statute ? It is contended, that she is : that she acquires by the judgement of the county court affirming the inquisition, and giving leave to lay out and open the road, a right of way, which, when it is bounded by a water course, varies and fluctuates with the fluctuations of the bed or banks of the stream ; that the seisin and freehold is not divested by the judgement of the county court, but remains with the original proprietor or his successors in interest; that upon an abandonment of the way by the public, it reverts to the proprietor of the land; that as, on the one hand, he continues riparian owner, entitled to the benefit of any acquisition of soil by alluvial accretion, or otherwise, and in addition to this benefit, has once received actual compensation, and is reversioner of the land occupied by the public when the public easement ceases; so, on the other hand, he should bear the risk of loss incident to land thus situated. There is certainly, some plausibility in this argument ; but we think when followed to its consequences, it will be found so utterly at war with the letter and spirit of our law, and indeed the general principles of justice, as to justify us in pronouncing the argument wholly untenable however specious. It will not be denied, that, in this commonwealth, private property can only be taken for public purposes, and then only upon making a just compensation to the party deprived. This is a sound principle of our fundamental law; and our road laws, in accordance with it, has certainly prescribed the mode in which the public right shall be exercised, as well as furnished the most guarded means by which this just compensation is to be ascertained *826 and paid-. A jury of freeholders is to view the identical on which it is proposed to conduct the highway; to identify the land with reasonable certainty in its inquisition; and to assess the value of the very land thus viewed and identified, as well as the value of the additional fencing made necessary by the road. The jury is not called upon, nor is it at liberty, to value a general right of way, confined to no fixed and determinate part of the land, which may shift with’ the whim or caprice, of the public, or with circumstances arising out of casualty or accident: if it were, it would be difficult, if not impossible, so to assess the value and damages as to constitute an equal and just measure of compensation; for it would depend upon contingent and subsequent events, whether its assessment would be too high or too low: if the road should be suffered to remain on sterile land, the estimate might be too high; if shifted from barren to fertile land, it might be too low. This same statute which has conferred the right upon the public (and imposed the conditions upon which the right may be exercised) to take private property for public uses in any case, has imposed this limit upon the right,—that in no case, without the consent of the owner, shall the mansion house, curtilage he. be invaded for public purposes, whether with or without compensation.
Let us now illustrate, by a few supposable and by no means extreme cases, the consequences to which the argument for the affirmative of this question inevitably leads. A strip of sterile land bounded by a water course, is condemned by the public for a- highway, and the value is assessed and paid; it is afterwards (as in this case) carried away by a flood : the commonwealth has the right to make reprisal of land of double, treble or quadruple value, without making any additional compensation. Suppose that by the operation of the flood, or other natural causes, the road is not only swept away, but the bank has receded so as to bring the stream' to the threshold of the mansion house or mill, or other valuable erection, or to the very verge of the *827 curtilage: it would necessarily result from sustaining the right claimed for the commonwealth, that the mansion house, mill or curtilage, might be entered by the commonwealth, in virtue of this shifting right of way, notwithstanding the limitation of the right imposed upon the public in original applications to establish roads. They could not only be entered and prostrated by the public, but would become indictable nuisances, according to one of the hypotheses of law involved in this prosecution. Suppose again, that all the lands of the proprietor who received compensation upon the writ of ad quod, damnum, be washed away, or so irreparably injured as to make a road upon them utterly impracticable : would not the doctrine contended for necessarily conduct us to this consequence, that the commonwealth would have a right to enter upon the land of an adjacent owner who had never received any compensation, and appropriate a sufficient quantity for the highway, without view, condemnation or compensation ? If such be the legitimate consequences flowing from the positions assumed on the affirmative side of this question, (and they appear to the court inevitably and necessarily to follow) the positions themselves must be condemned and repudiated as untenable and unsound. They must be discarded, because when compared with our statute, they are found to conflict with the plain and obvious interpretation of its provisions, with its letter and its spirit. That statute does not authorize the public against the consent of the owner, by the exercise of the sovereign power, to acquire a general right of way over his land : it must condemn a particular part of his land to be ascertained and identified. Upon what principle then, should we be justified in holding, that the land condemned shall remain at the risk of the original proprietor, rather than at the risk of the public, and that if destroyed by the flood, the commonwealth may indemnify herself by taking the adjacent land.
We consider the question, upon our statute, a clear one against the right claimed for the public: nor apart from the *828 statute, do we believe any authority in point can be adduced, either from the common or the civil law, to sustain the pretensions of the commonwealth : if any such exist, the court has not been referred to it. It is true that it is laid down by english commentators, and by the civilians, and ruled by the english judges in Taylor v. Whitehead, Doug. 744. as well as in cases before and subsequent, that if the usual track of a public way be rendered impassable, it is for the general good that the people should be allowed to pass over the adjacent land, and that such passage would not constitute a trespass: in this principle Blaclcstone says, the civil and the common law agree. The english authorities mentioned, expressly negative such a right in the case of private way. These authorities are not understood by this court as touching such a case as the present. They are understood to affirm the right of the public to a temporary way of necessity, in case of a reparable injury, until the highway can be repaired, and nothing more; by no means to transfer and permanently fix the right of way in a new location in case of total and irreparable destruction of the ancient way. The mode at present existing of acquiring land for public purposes in England, is precisely or very nearly the same as that prescribed by our statute—by writ of ad quod damnum. We are not apprised of any civilized code that would sanction such a claim on the part of the public, except that of Pennsylvania, where it would be reasonable and proper (subject to the limitation, that the curtilage shall not be invaded, in consequence of the shifting of the highway) because the public makes no compensation for the land condemned for the purpose of highways, the proprietor there having taken the land charged with the general public servitude of highways, expressly reserved by law in the earliest periods of the commonwealth, and being compensated in advance for the reservation. That state, in every grant, throws in, without compensation or price, six acres in the hundred, for which she reserves to herself the right of making as many roads through every man’s land as *829 the public interest requires, without compensation. Here, no such reservation is found in the grant or the law; no such compensation is made; and no man’s freehold shall be taken but upon payment of a fair, a just, a full compensation.
Therefore, the court is of opinion and doth decide—1. That the defendant is not bound to set in her fence and give more land, without a new view and condemnation of the same, in the manner of condemning lands for public highways. 2. That, even if the public were entitled to the land without compensation, the defendant could not be guilty of a nuisance until the road had been actually laid out and opened by the public, through the instrumentality of its agents. 3. That the offence charged, and the facts appearing by the case agreed (if the court had not decided that they constituted no offence), are too variant, to warrant a judgement of conviction.
Duncan, J. concurred in the two last resolutions; but he declined the expression of any opinion on the first point.